# EXHIBIT E

February 21, 2013

## SALES REPRESENTATION AGREEMENT

This Sales Representation Agreement (this "Agreement"), signed and effective as of this 21st Day of February 2013, by and between Advanced Technology Materials, Inc., a Delaware corporation, together with its wholly-owned subsidiaries, having a place of business at 7 Commerce Drive, Danbury, CT 06810 ("ATMI"), and Pharmaseptic, an Indiana Corporation having a place of business at 1920 Jacobs Lane, Chesterton, IN, 46304, USA. ("Representative").

### Recitals:

**WHEREAS**, ATMI is engaged in the manufacture and marketing of the Products (defined herein) and wishes to expand its market share in the Market Segment (defined below) within the Territory (defined herein);

**WHEREAS**, Representative has experience and skill in sales of products similar to the Products and desires to promote, market and offer for sale the Products in the Market Segment within the Territory; and

**WHEREAS**, Representative shall commence such representation as of 15th March 2010 under the terms and conditions set forth herein, and this Agreement, signed as of the date above first written, is intended to memorialize the terms agreed to by the parties.

### Agreement:

NOW, THEREFORE, ATMI and Representative agree as follows:

1. DEFINITIONS: Initial capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings set forth in Appendix A attached hereto.

2. APPOINTMENT: Subject to the terms and conditions of this Agreement, ATMI hereby appoints Representative as ATMI's exclusive sales representative to accounts other than established OEM accounts in the Market Segment within the Territory for the purpose of soliciting orders for the Products, and Representative hereby accepts such appointment; provided, however, that notwithstanding the foregoing, ATMI shall be permitted, without obligation to pay a commission, to make a discount or otherwise become liable to Representative, to sell Products in the Market Segment within the Territory to (a) any OEM purchasers where such Products are an integral part of some other end item of equipment (or of a system) being sold by ATMI and/or its Affiliates, and (b) any other purchaser having a principal place of business outside of the Territory even though any Products sold and delivered by ATMI and/or its affiliates may later be used or resold in the Market Segment within the Territory by such purchaser.

3. TERM: This Agreement shall remain in force for an initial period of one (1) year from the date this Agreement is signed, after which it shall be automatically extended from year to




year for one (1) year periods unless sooner terminated in accordance with the terms and conditions of this Agreement.

4. OBLIGATIONS OF REPRESENTATIVE; WARRANTY: Using its best efforts, Representative shall actively and diligently promote, market and solicit orders for the Products solely in the Market Segment of the Territory from customers and potential customers, excluding in each case House Accounts. Representative hereby represents and warrants to ATMI that it has sufficient resources to actively and diligently promote, market and solicit orders for the Products in accordance with this Agreement.

5. OBLIGATIONS OF ATMI: ATMI shall furnish to Representative without charge, all correspondence, inquiries (both written and oral) and similar information pertaining to actual or prospective sales of Products in the Market Segment within the Territory that are received by ATMI and/or its affiliates. ATMI further agrees to supply, as needed and without charge, promotional material, literature, brochures and printed catalogs in quantities deemed reasonable by ATMI in its good faith discretion in relation to the activities of the Representative and assist in the training of the Representative's sales and support personnel as ATMI deems necessary in its good faith discretion.

6. NO UNAUTHORIZED EXPENSES: ATMI shall not be liable to Representative for payment of any costs or expenses incurred by Representative as a result of its acts or omissions under this Agreement, unless otherwise previously agreed to in writing by ATMI. It is expressly understood that any third party engaged by Representative in accordance with Section 19 of this Agreement is engaged at Representative's own risk, expense, and supervision, and such persons shall not have any claim against ATMI for salaries, commissions, or otherwise.

7. PRICING AND DELIVERY QUOTATIONS: ATMI will provide quotations and prices to the Representative and customers as well as delivery dates and other terms and conditions. Except with the prior written consent of ATMI in each case, Representative does not have the right to quote prices to customers other than prices and terms listed in the price list provided by ATMI to Representative from time to time. Furthermore, Representative does not have the right to quote delivery dates or other terms and conditions other than ATMI's standard terms and conditions of sale (the current copy of which ATMI will provide to Representative at its request from time to time), to customers without ATMI's prior written consent of such delivery dates or terms and conditions. Representative shall indemnify and hold ATMI harmless for any claims, losses, costs, damages or other liabilities incurred by ATMI as a result of any act or omission by Representative in breach or default of this Section 7.

8. COMMISSIONS: Payments made by ATMI to Representative shall be according to the following:

    a. Solely for orders for Products (except for orders from House Accounts) accepted by ATMI during the term of this Agreement in the Market Segment in the Territory as a direct result of Representative's solicitation, ATMI shall pay commissions to



2

Representative at either the Commission Rates on Equipment or the Commission Rates on Consumables, as applicable.

  b. Only orders that are in compliance with an authorized quotation or price list supplied by ATMI, or based upon prices agreed by prior written authorization between ATMI and Representative, shall be considered for acceptance.

  c. Commissions shall be computed on the Gross Revenues.

  d. ATMI will, in a timely manner, supply Representative a "Salesman Copy" of each invoice sent to customers, for sales made by ATMI as a direct result of Representative's solicitation.

  e. ATMI reserves the right to negotiate special, reasonable, commission rates with the Representative on sales which are below the list price if such concessions are needed in a competitive situation.

  f. In the event of sales to OEM accounts where the sales process has been jointly developed, between ATMI and the Representative. ATMI shall pay commissions to the Representative, but at a reduced commission schedule which shall be agreed by both parties jointly.

  g. ATMI and Representative recognize that for certain customers the Product design, location, negotiation location, or ship to location may be divided among the territories of other representatives, and in such cases commissions shall be split as follows:-
  10% of total available commission will be paid to the rep in whose territory the PO is placed.
  10% of total available commission will be paid to the rep in whose territory the equipment and/or consumables are delivered to.
  80% of total available commission is paid, at ATMI's sales management's discretion, to the rep who made the sales effort to secure the business.

  h. All payments from ATMI to Representative shall be made net 45 days.

9. DEDUCTIONS FROM COMMISSIONS: ATMI will deduct from Representative's commissions the following: (a) commissions previously paid on Products which have been returned by the customer or for which a credit has been issued to the customer; (b) the difference in commission resulting from credit(s) issued to customer's account for additional discounts such as "prompt pay"; (c) commissions paid on sales which become un-collectible as determined by ATMI in its reasonable discretion, and which have been reviewed between ATMI and the Representative; or (d) commissions which are due other parties due to Commission Splits as defined in section 8g above.

10. SALES OUTSIDE TERRITORY: In the event that ATMI requests in writing the assistance of the Representative for a particular sale outside of the Territory, the Representative shall be entitled to the full sales commission, as if the sale was made within the Representative's Territory.



3

11. COMMISSION PAYMENT SCHEDULE: The payment of commissions is expressly conditional upon ATMI's acceptance of the order, expressly conditional upon ATMI's shipment, and expressly conditional upon ATMI receiving payment for such order. If and when these conditions are satisfied, ATMI shall pay the commission to the Representative on or before the twentieth (20th) day of the month following that month during which ATMI receives payment.

12. ADDITIONAL DUTIES: The Representative will, at a minimum, provide ATMI the following information and perform the following duties:

   a. Provide: (i) using Oracle based forecasting worksheets and forecasting guidelines provided by ATMI provide monthly sales forecast by customer and part number on or before the last Friday of each month.

   b. Using the contact and customer management software and process guidelines provided by ATMI, to routinely: (i) provide current Territory customer and prospective customer information and end-user name, (ii) request quotations, (iii) request trials, samples and applications resources (iv) qualify sales leads and (v) quantify business opportunities.

   c. Participate and attend regional trade shows. In the event that ATMI requests that Representative exhibit and promote products, present written and oral presentations or undertake other marketing activities that the parties agree, in good faith, are beyond ordinary participation in a trade show, Representative shall comply with ATMI's requests and ATMI shall reimburse Representative for its actual, out-of-pocket expenses for such extraordinary activities, subject to pre-approval by ATMI for expenditures in excess of $250 per trade show and reasonable documentation of expenses in accordance with ATMI's practices.

   d. Subject in part to ATMI's training obligations pursuant to Section 5, ensure that its sales and service personnel are properly trained on the Products.

   e. Promptly follow up and report in SalesForce.com per ATMI practices on all leads provided.

   f. Any additional reasonable sales forecasts and appropriate reports relating to solicitation of orders and the status of such orders and other pertinent marketing information requested by ATMI.

   g. Inform ATMI of any credit information Representative receives regarding any customer or prospective customer.

13. CONFIDENTIAL INFORMATION: Disclosures of confidential information shall be governed by the terms of the Confidential Disclosure Agreement entered into between the parties as of [_____] (the "CDA"). If the foregoing date is left blank, the Representative agrees to be subject to the terms of the CDA attached hereto as Appendix D. Representative shall acquire no rights to any of ATMI's intellectual property; provided,

4

however, that subject to the terms and conditions of this Agreement ATMI hereby licenses to Representative during the term of this Agreement the use of ATMI's trade names or logos solely for the purposes of this Agreement. Representative shall identify such trade names or logos as ATMI's when used and shall report to ATMI its use thereof. This Paragraph shall not survive the termination of this Agreement.

14. PROHIBITED ACTS: Representative shall not be an agent of or otherwise affiliated with any person or entity deemed by ATMI to be a competitor without notifying, and receiving written consent from, ATMI at least sixty (60) days prior to soliciting orders from or on behalf of any such competitor. Representative shall supply ATMI with a full and complete list of companies for which Representative acts as an agent within the Territory.

15. TERMINATION: Either party has the right to terminate this Agreement at any time with or without cause by providing not less than thirty (30) days written notice ("Termination Notice") to the other party of its election to terminate. In the event Termination Notice is given or this Agreement otherwise expires, Representative shall remit forthwith to ATMI all technical documentation, manuals, sales brochures, videos and other promotional material and literature and any other Confidential Information (as defined in the CDA) of ATMI relating to the promotion, marketing or sale of the Products, and shall neither retain nor disseminate to any person or entity copies thereof, all of which shall remain the property of ATMI at all times during the term of this Agreement and thereafter.

16. ATMI'S DUTIES AFTER TERMINATION NOTICE:

    a. If this Agreement is terminated by ATMI, ATMI's sole duty to the Representative is to pay any unpaid commissions, subject to deductions under Section 9, for orders accepted by ATMI prior to the date the Termination Notice is given and thirty (30) days thereafter, provided that the shipment occurs within sixty (60) days of the actual termination date, and further provided that if Representative did not perform its obligations under this Agreement, ATMI shall not pay commissions on orders received after the Termination Notice.

    b. If this Agreement is terminated by Representative, ATMI shall pay commission to the Representative on all sales shipped prior to or on the date the Termination Notice is given and ATMI shall not pay commission to the Representative for sales shipped after the date the Termination Notice is given.

17. REPRESENTATIVE'S DUTIES AFTER TERMINATION NOTICE: ATMI shall have the right to request Representative to call on specific accounts, for specific purposes at any time after the date the Termination Notice is given but prior to termination of this Agreement. The Representative shall deliver to ATMI all data available on any current sales or lead activity in progress and data on any possible future leads that the Representative may have in its possession.



5

18. INDEMNITY: Representative agrees to defend, indemnify and hold ATMI harmless from and against any and all losses, costs, damages, liabilities, expenses (including reasonable attorney's fees), claims or suits arising out of or related to any negligent acts or omissions of Representative. ATMI agrees to defend, indemnify and hold Representative harmless from and against any and all losses, costs, damages, liabilities, expenses (including reasonable attorney's fees), claims or suits arising out of or related to any negligent acts or omissions of ATMI.

19. ASSIGNMENT: This Agreement and any rights and duties hereunder may not be assigned, delegated or otherwise transferred (whether by merger, consolidation, operation of law or otherwise) by Representative without ATMI's prior written consent in each instance.

20. SEVERABILITY: If one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalid, illegal, or unenforceable portion shall not affect any other provisions of this Agreement. This Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had never been contained herein.

21. CONSTRUCTION: This Agreement constitutes the entire Agreement between the parties and shall supersede all previous communications, representations, and agreements, either verbal or written, between the parties hereto with respect to the subject matter hereof.

22. AMENDMENTS: This Agreement may only be amended by written agreement between the parties, except that ATMI has the right to unilaterally change or modify the price list upon notice to Representative. ATMI will endeavor to give Representative sixty (60) days notice of any change or modification to the price list.

23. GOVERNING LAW: This Agreement and any matters arising out of or relating thereto shall be controlled and construed under the laws of Connecticut, without regard to the conflicts of laws principles thereof.

24. NON-COMPETITION; NON-SOLICITATION. In consideration of the various agreements of ATMI set forth in this Agreement:

    a. during the term of this Agreement, Representative shall not, either on its own or through any affiliate, joint venture or by any other entity in which Representative has any interest whatsoever, develop, make, assemble, have made, use, distribute, promote, market, or sell the Products or any derivatives of the Products, or any products which are substantially the same as, or competitive with, the Products, or be financially interested in or otherwise assist with the development, making, assembly, use, distribution, promotion, marketing or sale of the Products, any derivatives of the Products or any other such competitive products;

    b. for six (6) months for each year (or portion of a year) of the term of this Agreement following the expiration or earlier termination of this Agreement, if this Agreement is

6

terminated by Representative for other than ATMI's breach or by ATMI for Representative's breach, Representative shall not, either on its own or through any affiliate, joint venture or by any other entity in which Representative has any interest whatsoever, develop, make, assemble, have made, use, distribute, promote, market, or sell the Products or any derivatives of the Products, or any products which are substantially the same as, or competitive with, the Products, or be financially interested in or otherwise assist with the development, making, assembly, use, distribution, promotion, marketing or sale of the Products, any derivatives of the Products or any other such competitive products;

c.  for six (6) months following the expiration or earlier termination of this Agreement, if this Agreement is terminated by ATMI without cause, and provided the Representative has worked for ATMI pursuant to the terms of this Agreement for a least one (1) year, Representative shall not, either on its own or through any affiliate, joint venture or by any other entity in which Representative has any interest whatsoever, develop, make, assemble, have made, use, distribute, promote, market, or sell the Products or any derivatives of the Products, or any products which are substantially the same as, or competitive with, the Products, or be financially interested in or otherwise assist with the development, making, assembly, use, distribution, promotion, marketing or sale of the Products, any derivatives of the Products or any other such competitive products; and

d.  Representative shall not, directly or indirectly, recruit, divert, solicit the employment or hire the employees or consultants of ATMI and its affiliates during the term of this Agreement and for a period of six (6) months thereafter; provided, however, that this Section shall not preclude Representative from hiring any employee or consultant who has been terminated by ATMI and its affiliates prior to commencement of employment discussions between Representative and such employee.

**IN WITNESS WHEREOF**, the undersigned have caused this Sales Representation Agreement to be executed by an authorized representative as of the date above first written.

**Advanced Technology Materials, Inc.**                    PharmAseptic, Inc.

By: _____                                 By: _____

Date: 2-21-13                                               Date: 2-22-2013
Name: Derek Pendlebury                                      Name: John F. Scribes
Title: Sales Director; Distribution Sales                   Title: President

7

## Appendix A

## Definitions

For purposes of this Agreement, the following terms shall have the meanings respectively assigned thereto in this Appendix A:

1. "Affiliates" means any legal entity that another entity controls, controls it, or with which it is under common control.

2. "Commission Rates on Consumables" means commission rate paid by ATMI to Representative on Gross Revenues for all consumables sold by the Representative in the Territory. Commission Rates on Consumables is detailed in Appendix B.

3. "Commission Rates on Equipment" means commission rate paid by ATMI to Representative on Gross Revenues for all equipment sold by the Representative in the Territory. Commission Rates on Equipment is detailed in Appendix B.

4. "Gross Revenues" means revenues actually received by ATMI less (i) trade and quantity rebates, (ii) credits, discounts or allowances given or made for rejections or returns of any previous sales, (iii) any tax, duties or other governmental charges paid by ATMI on such sales, and (iv) any charges in connection with freight and insurance.

5. "Pre-Established ATMI Accounts" means accounts where ATMI has historic relationships and established annuity revenues. The Pre-Established ATMI Accounts are listed in Appendix B of this Agreement and may be updated/revised quarterly.

6. "Base Business" means the annual revenue at Pre-Established ATMI Accounts which is considered an annuity secured by previous and historic ATMI selling activities.

7. "New Business" means revenue at Pre-Established ATMI Accounts which is additive to the Base Business and at Representative Accounts due to the selling activities of the Representative.

8. "Market Segment" means all biotechnology, biopharmaceutical, biologics and vaccine research and manufacturing companies or institutions in the Territory, excluding the House Accounts.

9. "OEM Accounts" means a either a person or entity that purchases Products for the purpose of adding value by incorporating Products as a component of a larger system or product that is sold by such person or its affiliates or a person or entity that purchases Products for resale.

10. "Products" means ATMI's Integrity™ BioProcess Vessels (BPV's), ATMI's Integrity™ Powder Transfer Vessels (PTV's) & Accessories, ATMI's Integrity™ Mixing systems,



8

namely PadMixer™, JetMixer,™ LevMixer™, WandMixer™ and Magnetic Mixer™ Single-Use Active Mixing Systems, Newform™ Cleansteam Bags & Accessories. Newform™ Medical Grade Bags, Nucleo™ Single Use Bioreactor systems, Pad-Reactor™ Single Use Bioreactor systems, Xpansion™ Single Use Bioreactor systems and Pad-iCellis™ Single Use Bioreactor systems. ATMI in its discretion may add other products that ATMI wishes Representative to market to the Market Segment in the Territory, and such added products shall be considered "Products" hereunder.

11. "Representative Accounts" means all accounts in the Territory Accounts but excluding House Accounts and Pre-Established ATMI Accounts listed in Appendix B. Appendix B may be updated/revised quarterly.

12. "Territory" means all Representative Accounts and Pre-Established ATMI Accounts (listed in the Appendix B of this Agreement) in the states of Michigan, Indianan, Ohio, Kentucky and Tennessee, plus the following 4 specific accounts :-
    a. BI-Vetmedica at Ft Dodge, IA
    b. Pfizer Animal Health, Charles City, IA
    c. Therapeutic Proteins Int. Chicago, IL
    d. Aldevron, Fargo, ND.

13. "House Account" means all ATMI accounts or strategic partners for which no Commissions are paid to the Representative. House Accounts are listed in Appendix B of this Agreement and may be updated/revised quarterly.



9

## APPENDIX B

### Commission Plan

**House Accounts**
Sartorius-Stedim Biotech, West Pharmaceuticals, Millipore Corporation, VWR and VWR International, Helvoet Pharma, Beckton Dickinson, Spectrum Laboratories, RMB Inc.

**Pre-Established ATMI Accounts:**
None

**Commissions for Base Business at Pre-Established ATMI Accounts:**
Not applicable

**Commissions for Representative Accounts and New Business at Pre-Established Accounts:**
15% on all consumable sales
10% on all hardware sales

**Note:** In events where Product to customer is negotiated and sold by Representative and ATMI below the List Price, ATMI reserves the right to negotiate commission rate with the Representative based on the commission structure identified below.

**For Consumable Sales**

| Sales Price | Commissions |
| --- | --- |
| List Price | 15% |
| 5-10% below list | 10% |
| 11-20% below list | 5% |
| >20% below list | 0% |

**For Hardware Sales**

| Sales Price | Commissions |
| --- | --- |
| List Price | 10% |
| 5-10% below list | 7% |
| 11-15% below list | 3% |
| >15% below list | 0% |

List price is defined as either
  a. list price ruling at time of sale or
  b. sales price derived from the pricing policy/model ruling at the time price was determined

## APPENDIX C

### Price List

A separate, current, electronic price list is available in the ATMI INSIGHT Toolkit.

 

11

**APPENDIX D**

**CDA**



**CONFIDENTIAL DISCLOSURE AGREEMENT**

☒ Please return a signed PDF copy to the ATMI Legal Department at contracts@atmi.com or fax a copy to +1 (203) 797-2544. Should you require original signatures, send two executed, hard copies to ATMI, Inc., 7 Commerce Drive, Danbury, Connecticut 06810, USA, Attn: Legal Department - Contracts.

This Confidential Disclosure Agreement ("Agreement"), dated and effective as of 21st February 2013 (the "Effective Date"), by and between Advanced Technology Materials, Inc., on behalf of itself and its wholly-owned subsidiaries ("ATMI"), and PharmAseptic ("Company"), sets forth the terms that will apply when one of us ("Discloser") discloses Confidential Information (as defined in Section 2) to the other ("Recipient"). The parties hereby agree as follows:

1. Disclosure. The following is a non-confidential description of Confidential Information, if any, to be disclosed by **ATMI, if any**:

   Information concerning ATMI's Life Sciences products and technologies.

   The following is a non-confidential description of Confidential Information, if any, to be disclosed by **Company, if any**:

   Information concerning companies business practices and partnerships with other suppliers

**Purpose:**
Confidential Information may be used for the following purpose:

   For ATMI's prospective and/or actual use of Company's finder's services.

3. Confidential Information. "Confidential Information" means non-public information disclosed by Discloser (whether such information is proprietary to Discloser, one of its Affiliates (as defined in Section 3), or a third party) to Recipient, or to which Recipient may gain access, whether in tangible, written, oral, electronic, website-based or other form however presented, such as current, future and proposed business, products and services of Discloser (including, without limitation, chemistries, materials, precursors, compounds, formulae, processes, methods, and specifications); product or strategic plans; forecasts; technical, marketing, financial or contracts information; pricing; patent applications, inventions (whether patentable or not), know-how and trade secrets and works of authorship; and customer and vendor information. To be considered "Confidential Information", information must either be (i) marked "confidential" or with a similar restrictive legend, or (ii) if disclosed orally, identified as confidential at the time of disclosure, and confirmed as confidential and summarized in a written communication that is sent to Recipient within forty-five (45) days of the disclosure, unless in either case the information would reasonably be understood by the Recipient to be confidential based on the nature of the information or the circumstances of its disclosure.

4. Obligations Regarding Confidential Information. During the confidentiality period set forth in Section 6, any Confidential Information received by Recipient shall be treated as strictly confidential in accordance with the terms and conditions of this Agreement. Recipient shall (i) use the same degree of care that Recipient uses to protect its own Confidential Information to prevent any unauthorized disclosure, dissemination or publication of Discloser's Confidential Information, but no less than a reasonable degree of care; and (ii) use the Confidential Information only for the Purpose for which it was disclosed or otherwise for the benefit of the Discloser. Recipient may disclose Confidential Information to (A) its employees (and employees of its Affiliates) who have a need to know such Confidential Information and who are advised of its confidential nature and directed to comply with this Agreement and (B) any other party with the Discloser's prior written consent. Before disclosure to any party referenced in (B), Recipient shall have a written agreement with the party sufficient to require that party to treat Confidential Information in accordance with this Agreement. Recipient shall not alter, modify, disassemble, reverse engineer, reverse compile, reconstruct or decompile any Confidential Information, in whole or in part, unless expressly permitted in writing to do so by an authorized representative of Discloser. Recipient agrees to notify Discloser in writing immediately of any unauthorized release or misuse of Confidential Information of which it becomes aware. "Affiliate" shall mean any legal entity that Recipient controls, controls it, or with which it is under common control. Recipient agrees to be responsible for any breach of this Agreement by its employees or Affiliates.

5. Exceptions to Obligations of Confidentiality. The obligations imposed upon the parties regarding the treatment of Confidential Information do not apply to any information that is (i) in Recipient's possession without obligation of confidentiality prior to its disclosure hereunder; (ii) publicly available when received, or subsequently becomes publicly available other than as a result of a violation of this Agreement; (iii) rightfully received by Recipient from a third party without a duty of confidentiality or other restriction on disclosure or use; or

Revised 7.2009

(iv) independently developed by Recipient without reliance upon or reference to any of Discloser's Confidential Information. Notwithstanding the foregoing, Confidential Information shall include (a) information that is specific, even if it is embraced by more general information in the public domain or in the possession of Recipient and (b) a combination of individual items of information, even if that combination could be reconstructed from non-confidential sources, if none of the non-confidential sources shows the whole combination and its principle of operation. For the avoidance of doubt, nothing herein restricts either party from marketing or providing products or services that compete with products or services of the other party or to engage in independent development of products or services similar to those developed by the other party. Recipient may disclose Confidential Information to the extent required by law; provided, however, that Recipient will provide Discloser with prompt written notice and shall reasonably cooperate with Discloser (at no cost to Recipient), so that Discloser may contest or seek to limit the scope of such required disclosure (including application for a protective order).

6. Title; IP. All Confidential Information is and shall remain Discloser's property and no right, title, interest or license thereto, is conveyed by Discloser hereunder. No express or implied license is granted by Discloser to Recipient under any patent, trademark, copyright, trade secret or other intellectual property right, except for the limited right to use Confidential Information for the Purpose for which it was disclosed

7. Confidentiality Period. Confidential Information disclosed pursuant to this Agreement will be subject to this Agreement for ten (10) years from the Effective Date. Expiration or termination of this Agreement shall not affect the rights of either party with respect to any violation occurring prior to such expiration or termination.

8. Termination; Duty to Return. Either party may terminate this Agreement by providing thirty (30) days' written notice to the other party; *provided* that any terms of this Agreement which by their nature extend beyond its termination (including Section 6 hereof) shall remain in effect until fulfilled. Upon such termination, Recipient shall promptly return or destroy (with written confirmation of such destruction), at the option of Discloser, all Confidential Information of Discloser, including any copies thereof, in whatever form, and any notes, summaries, reports, or other material prepared by Recipient or its employees that contain or are based upon Confidential Information of Discloser.

9. Injunctive Relief. Each party acknowledges that money damages may not be a sufficient remedy for any breach of this Agreement by the other party. Accordingly, in the event of any such breach or threatened breach, in addition to any other remedies at law or in equity that a party may have, such party shall be entitled to seek equitable relief, including injunctive relief or specific performance or both.

10. General Provisions. (i) This Agreement shall not create a joint venture, partnership, agency, or other form of association. (ii) DISCLOSER WARRANTS THAT IT HAS THE RIGHT TO DISCLOSE CONFIDENTIAL INFORMATION TO RECIPIENT AND PERMIT ITS USE UNDER THIS AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES ARE MADE; INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED ON AN "AS IS" BASIS; neither party assumes any responsibility whatsoever with respect to the accuracy or sufficiency of the Confidential Information and Recipient understands and agrees that Discloser will have no liability to Recipient arising from Recipient's actual use, intended or otherwise, of the Confidential Information except as may be otherwise agreed by the parties in writing. (iii) Before exporting or reexporting any Confidential Information, Recipient will comply with all applicable regulations of the U. S. Department of Commerce Office of Export Administration and other applicable U. S. or foreign agencies. (iv) This Agreement shall not be assignable or transferable, in whole or in part, by operation of law or otherwise, by either party without the prior written consent of the other party, except by act of corporate succession in the event of merger or sale of all of the assets of a party hereto. (v) Neither party has any obligation by virtue of this Agreement to proceed with any transaction between them, and any proposal, design or similar item presented to either party by the other shall be without obligation or restriction on the party (except as otherwise expressly provided herein). (vi) Any modification of or amendment to this Agreement will not be effective, and may not be relied upon by either party, unless and until reduced to writing and signed by both parties. (vii) No failure or delay by either party in exercising any right, power, or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege under this Agreement. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any remaining provisions, all of which shall remain in full force and effect. (ix) Headings set forth herein are for reference only and shall not affect the meaning or construction of this Agreement. (x) The parties agree, to the fullest extent permitted under law, to waive any right to a trial by jury.

10. Governing Law. This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Connecticut without regard to conflict of laws provisions.

11. Entire Agreement. This Agreement hereto constitutes the entire agreement between the parties with respect to the subject matter hereof and thereof and supersedes all prior oral or written agreements concerning such subject matter. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

Accepted and Agreed to:

COMPANY: PharmAseptic, Inc
Address: 1920 Jacob LN Chesterton, IN 46304
Facsimile: (219) 921-1099
Signature: [signed]
Name: John F. Swibes
Title: President

Advanced Technology Materials, Inc.
Address: 7 Commerce Drive, Danbury, CT 06810
  Attn: Chief Legal Officer
Facsimile: (203) 797-2544
Signature: [signed]
Name: Derek Pendlebury
Title: Distribution Sales Director, ATMI North America

Revised 7.2009